LEGAL SERVICES OF THE HUDSON VALLEY
By: Lara Kasper-Buckareff, Esq.
123 Grand Street
Newburgh, New York 12550
(845) 569-9110

Attorneys for Plaintiff Joseph Mosca, Jr.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOSEPH MOSCA, JR.,                                    :
                                                      :    11 Civ. _____
                    Plaintiff,                        :
                                                      :    ECF CASE
    - against -                                       :
                                                      :    **COMPLAINT &**
472 GRAMATAN OWNERS, INC.; 472                        :    **JURY DEMAND**
GRAMATAN OWNERS, INC. BOARD OF                        :
DIRECTORS; PAUL DONAHUE; DAVID                        :    **'11 CIV 01084**
FRANKS; HUDSON NORTH MANAGEMENT,                      :
LLC; RICK TANCREDI; GRAMATAN                          :    *JUDGE SEIBEL*
MANAGEMENT, INC.; BRAM FIERSTEIN; and                 :
GARY GUTEKUNST,                                       :
                                                      :
                    Defendants.                       :
------------------------------------------------------------x

    Plaintiff JOSEPH MOSCA, JR. (hereinafter "Mr. Mosca" or "Plaintiff"), through his

attorneys, for his Complaint, alleges as follows:

## NATURE OF THE ACTION

    1.  Mr. Mosca files this Complaint seeking declaratory and injunctive relief and damages

against 472 GRAMATAN OWNERS, INC. (hereinafter "the Cooperative"), 472 GRAMATAN

OWNERS, INC. BOARD OF DIRECTORS (hereinafter "the Board"), PAUL DONAHUE

(hereinafter "Donahue"), DAVID FRANKS (hereinafter "Franks"), HUDSON NORTH

MANAGEMENT, LLC (hereinafter "Hudson North Management"), RICK TANCREDI

1

(hereinafter "Tancredi"), GRAMATAN MANAGEMENT, INC. (hereinafter "Gramatan Management"), BRAM FIERSTEIN (hereinafter "Fierstein"), and GARY GUTEKUNST (hereinafter "Gutekunst") (collectively "Defendants"), because of Defendants' unlawful discrimination against Mr. Mosca under the Fair Housing Amendments Act of 1988 (hereinafter "FHA"), the New York State Human Rights Law (hereinafter "NYSHRL"), and the Westchester County Human Rights Law (hereinafter "WCHRL").

2. In or about July 2009, Defendants Cooperative, Board, Donahue, Franks, Hudson North Management, and Tancredi revoked Mr. Mosca's parking spot that he had timely paid for and used since in or about 2003. As a result, Mr. Mosca who is disabled and uses a wheelchair for mobility no longer has access to the only wheelchair-accessible parking in reasonable proximity to his building. He is therefore unable to use and enjoy his apartment to the same extent as the non-disabled residents of his building.

3. In or about November 2009, the aforesaid Defendants denied Mr. Mosca's multiple requests that his parking spot be restored as a reasonable accommodation. Thereafter, in or about January 2010, Mr. Mosca filed complaints with the Westchester County Human Rights Commission (hereinafter "WCHRC") and the United States Department of Housing and Urban Development (hereinafter "HUD"), alleging discrimination under the WCFHL and FHA respectively.

4. Donahue began parking his vehicle in Mr. Mosca's former parking spot shortly after he received a demand letter from Mr. Mosca's attorney requesting the reasonable accommodation and threatening suit. Donahue parked and continues to park there with the knowledge and consent of the Defendants who knew that Mr. Mosca had requested the parking

accommodation. Therefore, Defendants have unlawfully retaliated against Mr. Mosca in violation of the FHA, NYHRL, and WCHRL.

5. In or about June 2010, the WCHRC rendered a Determination and Order finding probable cause that the named Defendants had engaged in unlawful discrimination under the WCFHL. On or about September 8, 2010, pursuant to WCHRL § 700.29(A)(1), the named Defendants thereafter elected to have Mr. Mosca's claims decided in a civil action in lieu of an administrative hearing.

6. In or about December 2010, Defendants Gramatan Management, Fierstein, and Gutekunst denied Mr. Mosca's request that his parking spot be restored as a reasonable accommodation.

7. Mr. Mosca now commences this action to redress the discrimination he has suffered at the hands of the Defendants. He seeks to enforce the FHA, NYSHRL, and WCFHL so that he may once again be able to use and enjoy his apartment to the same extent as the non-disabled residents in his building.

## JURISDICTION

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.*, and therefore involves the resolution of a federal question.

9. This Court has supplemental jurisdiction over the state and county claims pursuant to 28 U.S.C. § 1367 as those claims arise from a common nucleus of operative facts and are so interrelated with the federal claims as to make supplemental jurisdiction appropriate.

10. This Court has personal jurisdiction over the Cooperative because it is a domestic business corporation organized and existing under the laws of the State of New York and has its principal place of business in New York State.

11. This Court has personal jurisdiction over the Board because the Board regularly conducts the Cooperative's business in the State of New York.

12. This Court has personal jurisdiction over Hudson North Management because it is a domestic limited liability company organized and existing under the laws of the State of New York and has its principal place of business in New York State.

13. This Court has personal jurisdiction over Donahue because he is domiciled in the State of New York.

14. This Court has personal jurisdiction over Franks because he is domiciled in the State of New York.

15. This Court has personal jurisdiction over Tancredi because, upon information and belief, he is domiciled in the State of New York and regularly conducts business in the State of New York.

16. This Court has personal jurisdiction over Gramatan Management because it is a domestic business corporation organized and existing under the laws of the State of New York and has its principal place of business in New York State.

17. This Court has personal jurisdiction over Fierstein because, upon information and belief, he is domiciled in the State of New York and regularly conducts business in the State of New York.

18. This Court has personal jurisdiction over Gutekunst because, upon information and belief, he is domiciled in the State of New York and regularly conducts business in the State of New York.

## VENUE

19. Venue properly lies within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, all of the Defendants reside in the State of New York and at least one of the Defendants resides in County of Westchester, State of New York which is within the jurisdiction of the Southern District of New York; and a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated in the County of Westchester, State of New York which is within the jurisdiction of the Southern District of New York. Venue also properly lies within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(c) because the Cooperative is subject to personal jurisdiction at the time the action is commenced, and so resides in the County of Westchester, State of New York which is within the jurisdiction of the Southern District of New York.

## THE PROPERTY

20. At all times relevant Mr. Mosca has resided, and currently resides, at 472 Gramatan Avenue (hereinafter "the Property"), Building #6 (hereinafter "Building Six"), Apartment 4-BB, Mount Vernon, New York (hereinafter "the Apartment"). Mr. Mosca lives alone in his Apartment.

21. The entrance to Building Six is off of Cedar Street. Gramatan Avenue intersects with and is to the east of Cedar Street. Fleetwood Avenue intersects with and is to the west of Cedar Street.

22. Mr. Mosca's former parking spot is located in the smaller of two parking lots that service the residents of the Property. This smaller lot is located at the corner of Cedar Street and Fleetwood Avenue and can only be accessed via a narrow entrance-exit way off of Cedar Street. The larger lot is located on Fleetwood Avenue and can only be accessed off of Fleetwood Avenue. Mr. Mosca's parking spot was originally designated Spot #882 but has since been renumbered Spot #89 (hereinafter the "Parking Spot").

## PARTIES

Plaintiff – Joseph Mosca, Jr.

23. Mr. Mosca is a citizen of New York State and the United States of America. He is 44 years old.

24. Mr. Mosca suffers, and at all times relevant suffered, from multiple physical, mental, psychological, and/or medical impairments, including but not limited to, the following:

a. Diabetes type one with related complications;

b. Bilateral amputation of the legs;

c. Hypertension;

d. Kidney transplant recipient with remaining renal complications;

e. Coronary artery disease status-post percutaneous coronary intervention;

f. Status-post parathyroidectomy and thyroidectomy;

g. Bilateral trigger fingers;

h. Visual impairment due to blindness in right eye and compromised vision in left eye;

i. Tendonitis in the shoulders;

j. Depression; and

k. Anxiety.

25. Because of his handicaps and disabilities (hereinafter collectively "disabilities"), Mr. Mosca uses a wheelchair and sometimes prosthetics for mobility.

26. Due to his disabilities which prevent him from exercising, Mr. Mosca is obese, weighing over 275 lbs. Mr. Mosca is approximately six feet tall with his prosthetics.

27. Mr. Mosca's impairments substantially limit one or more major life activities, including but not limited to, caring for himself, performing manual tasks, seeing, walking, standing, lifting, bending, working, and the operation of one or more major bodily functions, including but not limited to, neurological, brain, circulatory, and endocrine functions.

28. Mr. Mosca's physical, mental and/or medical impairments result from anatomical, physiological, genetic and/or neurological conditions which prevent the exercise of normal or unimpaired bodily functions or are demonstrable by medically accepted clinical or laboratory diagnostic techniques.

29. Mr. Mosca has a record or history of one or more of the impairments in paragraph 24.

30. Mr. Mosca is regarded or perceived as having, and has one or more conditions regarded by others as, one or more of the impairments in paragraph 24.

Defendant – The Cooperative

31. The Cooperative is a New York State domestic business corporation with its principal place of business at 472 Gramatan Avenue, Mount Vernon, NY 10552.

32. The Cooperative owns, and through its Board manages and leases apartments at, the Property, including Building Six and the two parking lots that service the residents of the Property.

Defendant – The Board

33. The Board is the governing body of the Cooperative. The Board's individual directors are elected by the cooperative's shareholders.

Defendant – Donahue

34. Donahue is an individual domiciled in the State of New York and is the President of the Board.

Defendant – Franks

35. Franks is an individual domiciled in the State of New York and is the Vice President of the Board. Upon information and belief, he was also the Cooperative's "Parking Coordinator" before and in July 2009 and held this position until in or about January 2010.

Defendant – Hudson North Management

36. Hudson North Management is a New York State domestic limited liability company with its principal place of business at 1053 Saw Mill River Road, Ardsley, New York 10502, and upon information and belief, until January 2010 was the Property Manager of the Cooperative.

Defendant – Tancredi

37. Upon information and belief, Tancredi is domiciled in the State of New York, and until January 2010, as an employee or agent of Hudson North Management, he acted as the Property Manager of the Cooperative.

Defendant – Gramatan Management

38. Gramatan Management is a New York domestic business corporation with its
principal place of business at 2 Hamilton Avenue, Suite 217, New Rochelle, NY 10801, and
upon information and belief, since in or about January 2010 has been the Property Manager of
the Cooperative. Upon information and belief, in or about January 2010, Gramatan Management
assumed the duties formerly exercised by David Franks as "Parking Coordinator."

Defendant – Fierstein

39. Upon information and belief, Fierstein is domiciled in the State of New York and is
the President of Gramatan Management.

Defendant – Gutekunst

40. Upon information and belief, Gutekunst is domiciled in the State of New York and is
the Vice President of Gramatan Management.


## FACTUAL ALLEGATIONS

### Mr. Mosca's Apartment and Parking Spot

41. Mr. Mosca has resided in the Apartment as a lessee since in or about 2001.

42. In or about 2003, upon Mr. Mosca's request, the superintendent assigned the Parking
Spot to Mr. Mosca for rent at $50.00 per month.

43. At the time the Parking Spot was assigned to Mr. Mosca, the superintendent was
responsible for assigning parking spots and controlling the parking lots generally.

44. Upon information and belief, the superintendent provided the Parking Spot to Mr.
Mosca as a reasonable accommodation to his disabilities so that the various individuals who

parking fee to Shareholder Robert Compasso who would draft a check for the maintenance and parking fees to the Cooperative and mail the invoice and the check to Hudson North Management.

51. The entire time that Mr. Mosca had the Parking Spot, and without any objection from Defendants Cooperative, Board, Donahue, Franks, Hudson North Management, and Tancredi, Mr. Mosca allowed several individuals who provided him care and/or transportation to park their vehicles in the Parking Spot. These individuals included, but are not limited to, the following:

    a. Mr. Mosca's ambulette drivers who transport him to and from medical appointments;

    b. Mr. Mosca's prosthetics provider who provided services to him at the Apartment;

    c. Mr. Mosca's private and state nurses who provided services to him at the Apartment;

    d. Mr. Mosca's state social workers who provided services to him at the Apartment;

    e. Mr. Mosca's former fiancé who lived with him from in or about 2003 until in or about 2008; and

    f. Mr. Mosca's friends and relatives who frequently transported Mr. Mosca to and from the Apartment in their vehicles and provided him care, including, but not limited to, socialization as treatment for Mr. Mosca's depression and anxiety.

**The Defendants Revoke Mr. Mosca's Parking Spot**

52. On or about July 9, 2009, Tancredi sent a letter on Hudson North Management's letterhead to the Shareholders notifying them that the Parking Spot was revoked effective July 1, 2009 because the "Parking Coordinator," upon information and belief David Franks, brought to Hudson North Management's attention that the Shareholders "do not have a vehicle of [their]

own and [] do not live in the building" (hereinafter the "Revocation Letter"). Tancredi signed the letter as the "Property Manager," and above his signature put, "Hudson North Management LLC. as Agent for 472 Gramatan Owners, Inc." Tancredi carbon copied the Board on his letter. As of the date of this letter, Mr. Mosca was current in his monthly payment for the parking spot, including the payment for July 2009.

53. Upon information and belief, there is no written agreement between any of the Defendants and Shareholders and/or Mr. Mosca with respect to the Parking Spot.

54. Upon information and belief, there are no valid and binding proprietary lease provisions, by laws, house rules, or other forms of regulation that restrict parking spots at the Property to vehicles owned by shareholders who live in the building.

55. Even if there is a valid and binding regulation of some kind, the Defendants are selectively enforcing such regulation in an intentionally discriminatory manner. For example, upon information and belief, until very recently, the Defendants did not take any action against a shareholder who lives in Building #4 and has a parking spot, but no vehicle.

56. Despite Tancredi's July 2009 letter, the Shareholders continued receiving monthly invoices from Hudson North Management that included the parking fee until the invoice for November 2009. Mr. Mosca, through Shareholder Compasso, timely paid the parking fees for August, September, October, and November 2009. Hudson North Management and the Cooperative accepted and retained all of these payments without otherwise crediting Mr. Mosca's account except for the parking fee payment for the November 2009 invoice which was applied to Mr. Mosca's maintenance fee in the following month.

**The Defendants Repeatedly Refuse to Reinstate Mr. Mosca's Parking Spot**

**As a Reasonable Accommodation and**

**Donahue Parks His Vehicle in Mr. Mosca's Parking Spot**

57. On or about November 2, 2009, the Shareholders, through their attorney Janet A. Paganelli, sent a letter to Tancredi at Hudson North Management demanding that Mr. Mosca's Parking Spot be restored as a reasonable accommodation to his disabilities (hereinafter the "First Demand Letter").

58. The First Demand Letter disclosed Mr. Mosca's disabilities, explained that "he has aides, family members and friends who come to his home regularly to provide for his care and transportation[,]" and demanded the Parking Spot be reinstated.

59. Upon information and belief, Defendants did not respond to the First Demand Letter, thus refusing to grant Mr. Mosca's first reasonable accommodation request.

60. On or about November 30, 2009, Mr. Mosca, through his attorney Lara Kasper-Buckareff, sent a letter to Defendants Donahue and Tancredi demanding they restore the Parking Spot to him as a reasonable accommodation to his disabilities (hereinafter the "Second Demand Letter"). This letter was sent by United States Postal Service certified mail, return receipt requested and first-class mail. Ms. Kasper-Buckareff received the signed return receipt cards back from both Donahue and Tancredi and the first-class mailings were not returned to Ms. Kasper-Buckareff.

61. The Second Demand Letter notified the aforesaid Defendants of Mr. Mosca's disabilities, that his caregivers require use of the parking spot in order to provide sufficient care and to safely transport Mr. Mosca to and from the building, and demanded the Parking Spot be reinstated.

62. Defendants did not respond to the Second Demand Letter, thus refusing to grant Mr. Mosca's second reasonable accommodation request.

63. Upon information and belief, after Donahue received the Second Demand letter on or about December 3, 2009, Donahue began parking his vehicle in the Parking Spot in retaliation against Mr. Mosca exercising his protected rights.

64. Upon information and belief, Defendants Cooperative, Board, Franks, Hudson North Management, and Tancredi and later Defendants Gramatan Management, Fierstein, and Gutekunst knew that Donahue was parking and continues to park, and consented to Donahue parking, his vehicle in the Parking Spot.

65. In or about January 2010, Mr. Mosca filed complaints with the WCHRC and HUD against Defendants Cooperative, Board, Donahue, Hudson North Management, and Tancredi alleging that the aforesaid Defendants' revocation of his Parking Spot, and their failure to reinstate the Parking Spot as a reasonable accommodation, constituted unlawful discrimination in violation of the WCFHL and the FHA respectively.

66. In or about June 2010, the WCHRC rendered a Determination and Order finding probable cause that the Defendants engaged in unlawful discrimination under the WCFHL in refusing to reasonably accommodate Mr. Mosca's disabilities.

67. On or about December 10, 2010, Mr. Mosca, through his attorney Lara Kasper-Buckareff, sent a letter to Defendants Gramatan Management, Fierstein, and Gutekunst, demanding they restore the Parking Spot to him as a reasonable accommodation to his disabilities (hereinafter the "Third Demand Letter").

68. The Third Demand Letter notified the aforesaid Defendants of Mr. Mosca's disabilities, advised them of the nature and outcome of the WCHRC litigation (even enclosing

copies of the amended WCHRC and HUD complaints and the WCHRC's Determination and Order), and demanded the Parking Spot be reinstated as a reasonable accommodation to his disabilities.

69. The aforesaid Defendants did not respond to the Third Demand Letter, thus refusing to grant Mr. Mosca's reasonable accommodation request.

70. Upon information and belief, parking spot # 91, located in the same small parking lot as the Parking Spot, was available the entire time that Mr. Mosca's complaint was pending before the WCHRC and remains available as of the filing of this Complaint.

**The Parking Spot Afforded Mr. Mosca Equal Opportunity**

**To Use and Enjoy His Apartment**

71. The Parking Spot is necessary to afford Mr. Mosca equal opportunity to use and enjoy his Apartment because of the nature of his disabilities, the obstacles that Mr. Mosca faces in leaving and entering the Apartment and Building Six, the very limited on-street parking on the Building Six side of Cedar Street, the high curb on Cedar Street, the very limited public parking within reasonable proximity of Building Six, and the lack of any short-term parking at the Property for loading and unloading Mr. Mosca from vehicles and other short-term purposes.

72. Mr. Mosca uses his power wheelchair in and around the Apartment and when he is transported by the ambulette service to medical appointments. When Mr. Mosca is transported by anyone other than the ambulette service, he uses his manual wheelchair because his power wheelchair is too heavy and large for most non-commercial vehicles.

73. When leaving and returning to the Apartment, Mr. Mosca must take an elevator with manual doors. Due to his disabilities, Mr. Mosca finds opening and holding these doors to be difficult. When he is in his power wheelchair, he finds it a little easier because he is able to use

the chair's power along with his prosthetic feet and legs to aid in opening and holding the doors. When Mr. Mosca uses his manual wheelchair, such as when he is going to be transported in any vehicle other than the ambulette, he requires the assistance of another person to open and hold the doors to avoid injury and exacerbation of his disabilities, including his bilateral trigger fingers. Normally, the person who is transporting Mr. Mosca is the only person who is present and able to assist him in opening and holding the elevator doors.

74. Once Mr. Mosca gets out of the elevator on the bottom floor, he has two more manual doors with no automatic door openers that he must pass through to exit Building Six. Again, when Mr. Mosca is in his manual wheelchair, he requires the assistance of another person to open and hold the doors to avoid injury and exacerbation of his disabilities, including his bilateral trigger fingers. Normally, the person who is transporting Mr. Mosca is the only person present and able to assist him in opening and holding these doors.

75. There is very limited on-street parking on the Building Six side of Cedar Street, so finding parking at this location is the exception, not the rule. There are three no parking areas on the Building Six side of Cedar Street—leading up to and at the corner of Gramatan Avenue, in front of Building Six, and leading up to and at the corner of Fleetwood Avenue. The rest of the parking on the Building Six side of Cedar Street is one hour parking with no parking on Wednesdays from 8 a.m. to Noon.

76. Even if there is on-street parking available on the Building Six side of Cedar Street, Mr. Mosca cannot safely get into and out of a vehicle parked there. Due to the approximately eight (8) inch high curb on Cedar Street in front of Building Six, Mr. Mosca is not able to enter a vehicle parked on the Building Six side of Cedar Street from the sidewalk. A vehicle must be parked sufficiently away from the curb so that Mr. Mosca, wearing his two prosthetic legs, has

16

room to step down from the sidewalk and stand on Cedar Street next to the vehicle before entering the vehicle. Due to his disabilities, it is difficult and unsafe for Mr. Mosca to step off this high curb. In inclement weather, it is only more difficult and unsafe. Mr. Mosca could fall and seriously injure himself stepping off the curb.

77. There is very limited on- and off-street public parking within reasonable proximity of Building Six. There are a limited number of public parking places and these are time limited, e.g., two hour metered parking. These parking places are not a sufficient substitute for the Parking Spot because they are not close enough to Building Six for loading and unloading Mr. Mosca into vehicles and they are time limited.

78. There is no short-term parking at the Property for loading and unloading Mr. Mosca from vehicles and other short-term purposes.

79. Mr. Mosca uses his power wheelchair when he is transported by the ambulette service. When he had the Parking Spot, the ambulette parked in the Parking Spot and Mr. Mosca would power himself and his chair onto the ambulette's lift. Due to the low height of ambulette's lift, the ambulette is not able to lift Mr. Mosca from the sidewalk on Cedar Street.

80. Depending upon various factors, such as the weather, the reason for leaving the Apartment, and Mr. Mosca's health at the particular time, the process of getting Mr. Mosca prepared to leave the Apartment, getting him out of the Apartment, and getting Mr. Mosca and his manual wheelchair into a vehicle can take up to forty minutes.

81. Depending upon various factors, such as those listed in the foregoing paragraph, the process of getting Mr. Mosca out of the vehicle, into his wheelchair, and settled back into his Apartment can take up to forty minutes.

82. In addition to Mr. Mosca needing the Parking Spot to enable him to be safely transported by vehicle and thereby leave his Apartment, Mr. Mosca also requires the Parking Spot so that his caregivers who provide him necessary services and/or treatment have a place to park that is unlimited in time within reasonable proximity of Building Six. These caregivers include Mr. Mosca's private and state nurses, prosthetics provider, state social worker, and friends and family.

83. Since losing the Parking Spot, Mr. Mosca's ambulette has been forced to park in the middle of the small parking lot, thereby blocking other vehicles from entering and exiting the lot for in or about 30 minutes each way.

84. When Mr. Mosca had the Parking Spot, one or both of the Shareholders would transport Mr. Mosca several times a month. The purpose of the trips varied—taking Mr. Mosca out to dinner, to a bar, to see a movie, shopping, and to see family members—are a few examples. Since losing the Parking Spot, the Shareholders transport Mr. Mosca significantly less—only once every few months—because there is no accessible place to park and load and unload Mr. Mosca.

85. When Mr. Mosca had the Parking Spot, his sister, Lynne Rothman, would transport him several times a year, usually to take him shopping. Since losing the Parking Spot, Ms. Rothman has not transported him.

86. When Mr. Mosca had the Parking Spot, his friends and family visited him several days a week at various times of day, sometimes for several hours. Since losing the Parking Spot, Mr. Mosca has had significantly fewer visits from friends and family. Those visits that he has had have been considerably shorter, and so much less satisfying, because the parking within reasonable distance of the Property is time limited.

87. Without the Parking Spot, Mr. Mosca has lost valuable caregivers' services, has become significantly more isolated, and feels like he is a prisoner in his own Apartment as he is unable to come and go like the other residents in his building.

88. As a result of the Defendants revoking his Parking Spot and retaliating against him on account of exercising his protected rights, Mr. Mosca has experienced feelings of anxiety, depression, stress, frustration, humiliation, and anger, and has suffered adverse physical symptoms, including but not limited to, insomnia.

<u>**Count I**</u>
<u>Federal Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988</u>
<u>(42 U.S.C. § 3601 *et seq.*)</u>

89. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 88, above.

90. Mr. Mosca is, and at all times relevant was, a person with a "handicap" as defined in 42 U.S.C. § 3602(h).

91. Defendants knew, or reasonably should have known, of Mr. Mosca's handicaps.

92. The Apartment is a "dwelling" as defined in 42 U.S.C. § 3602(b).

93. The Cooperative owns, manages, and leases dwellings at the Property, including the Apartment and Building Six. The Cooperative also owns, possesses, and leases parking spots at the Property.

94. The Board manages and leases dwellings and parking spots at the Property, including the Apartment and Building Six.

95. The following are, or during relevant time periods were, managing agents of the Cooperative:

a. The Board,

b. Donahue, as President of the Board,

c. Franks, as the Vice President of the Board and the Cooperative's Parking Coordinator,

d. Hudson North Management, as the Cooperative's property manager,

e. Tancredi, as an employee of Hudson North Management and working as the property manager for the Cooperative, and

f. Gramatan Management, as the Cooperative's property manager.

96. Fierstein, as President of Gramatan Management, and Gutekunst, as Vice President of Gramatan Management, are agents of Gramatan Management, and upon information and belief, agents of the Cooperative.

97. The FHA states that it is unlawful, "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person or a person residing in . . . that dwelling after it is so sold, rented or made available." 42 U.S.C. § 3604(f)(2)(a).

98. Under the FHA, an unlawful discriminatory housing practice includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. . . ." 42 U.S.C. §3604(f)(3)(B). *See also* 24 C.F.R. § 100.204.

99. Mr. Mosca requires the Parking Spot in order for him to receive sufficient care and safe transportation to and from the Apartment, and therefore is necessary to afford Mr. Mosca an equal opportunity to use and enjoy the Apartment.

100.    Defendants' conduct described above, in particular revoking and refusing to reinstate Mr. Mosca's Parking Spot or otherwise reasonably accommodate his disabilities, constitutes a refusal to make a reasonable accommodation in policies, practices, or services in violation of the FHA.

101.    If there is a valid and binding regulation that does not accord Mr. Mosca the right to a parking spot, the Defendants are selectively enforcing such regulation in an intentionally discriminatory manner.

102.    Under the FHA, an unlawful discriminatory housing practice includes coercing, intimidating, threatening, or interfering with "any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected by [42 U.S.C. §§ 3603, 3604, 3605, or 3606]." 42 U.S.C. § 3617. *See also* 24 C.F.R. § 100.400.

103.    Defendants' conduct described above, in particular, Donahue parking his vehicle in the Parking Spot on account of Mr. Mosca exercising his rights under the FHA with Defendants' knowledge and consent, thereby intimidating Mr. Mosca in the exercise of, or on account of his having exercised, his protected rights, constitutes unlawful retaliation under the FHA.

104.    Mr. Mosca is an "aggrieved person" as defined in 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages as a result.

105.    Defendants acted intentionally with malice or reckless indifference to Mr. Mosca's statutorily protected rights.

106.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**Count II**
New York State Human Rights Law
(New York Executive Law § 290 *et seq*.)

107.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 106, above.

108.    Mr. Mosca is, and at all times relevant was, a person with a "disability" as defined in New York Executive Law § 292(21).

109.    Defendants knew, or reasonably should have known, of Mr. Mosca's disability.

110.    The Apartment is a "housing accommodation" within the meaning of New York Executive Law § 292(10).

111.    Defendants are "persons," "owners," "managing agents," "agents," "employees," "other persons having the right of ownership of or possession of or the right to rent or lease housing accommodations," and/or "other persons having the right of ownership or possession of or the right to sell, rent or lease land" within the meaning of the NYHRL.

112.    The Cooperative owns, manages, and leases housing accommodations at the Property, including the Apartment and Building Six.  The Cooperative also owns, possesses, and leases parking spots at the Property.

113.    The Board manages and leases housing accommodations at the Property, including the Apartment and Building Six.

114.    Donahue, as President of the Board, and Franks, as Vice President of the Board and the Cooperative's "Parking Coordinator," were and are managing agents and agents of the Cooperative.

115. Hudson North Management, as the Cooperative's property manager, and Tancredi, as an employee of the Management Company and working as the property manager for the Cooperative, were managing agents and agents of the Cooperative.

116. Gramatan Management, as the Cooperative's property manager, is a managing agent and agent of the Cooperative.

117. Fierstein, as President of Gramatan Management, and Gutekunst, as Vice President of Gramatan Management, are agents of Gramatan Management, and upon information and belief, agents of the Cooperative.

118. Under New York Executive Law § 296(5)(a)(2), it is an unlawful discriminatory practice for the owner, managing agent of, or other person having the right to sell, rent or lease a housing accommodation, or any agent or employee thereof, to discriminate against any person because of disability in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.

119. Under New York Executive Law § 296(5)(b), it is an unlawful discriminatory practice for the owner or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent or lease land to discriminate against any person because of disability in the terms, conditions or privileges of the sale, rental or lease of any such land; or in the furnishing of facilities or services in connection therewith.

120. Under the NYHRL, "It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right of ownership of or possession of or the right to rent or lease housing accommodations . . . [t]o refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a

dwelling, including reasonable modification to common use portions of the dwelling." New York Executive Law § 296(18)(2).

121.    Mr. Mosca requires the Parking Spot in order for him to receive sufficient care and safe transportation to and from the Apartment, and therefore is necessary to afford Mr. Mosca an equal opportunity to use and enjoy the Apartment.

122.    Defendants' conduct described above, in particular revoking and refusing to reinstate Mr. Mosca's Parking Spot or otherwise reasonably accommodate his disabilities, constitutes a refusal to make a reasonable accommodation in rules, policies, practices, or services in violation of the NYSHRL.

123.    If there is a valid and binding regulation that does not accord Mr. Mosca the right to a parking spot, the Defendants are selectively enforcing such regulation in an intentionally discriminatory manner.

124.    Under New York Executive Law § 296(7), it is "an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

125.    Defendants' conduct described above, in particular, Donahue parking his vehicle in the Parking Spot in retaliation or discrimination against Mr. Mosca because he opposed an unlawful discriminatory practice under the NYHRL with Defendants' knowledge and consent constitutes an unlawful discriminatory practice under New York Executive Law § 296(7).

126. Upon information and belief, Defendants committed unlawful discriminatory practices under New York Executive Law § 296(6) in aiding, abetting, inciting, compelling or coercing the doing of the above unlawful discriminatory acts, or attempting to do so.

127. Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

128. Defendants acted intentionally with malice or reckless indifference to Mr. Mosca's statutorily protected rights.

129. Accordingly, under Article 15 of the New York Executive Law § 297, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs. In addition, this court should order the Defendants to pay civil penalties.

### Count III
Westchester County Fair Housing Law
(Westchester County Human Rights Law § 700 *et seq.*)

130. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 129, above.

131. Mr. Mosca is, and at all relevant times was, a person with a "disability" as defined in the WCFHL § 700.20(D).

132. Defendants knew, or reasonably should have known, of Mr. Mosca's disabilities.

133. The Apartment is a "housing accommodation" within the meaning of the WCFHL § 700.20(I).

134. Defendants are "persons," "owners," "lessors," "managing agents," "agents," and/or "employees" within the meaning of the WCFHL.

135. The Cooperative owns, manages, and leases housing accommodations at the Property, including the Apartment and Building Six.

136. The Board manages and leases housing accommodations at the Property, including the Apartment and Building Six.

137. Donahue, as President of the Board, and Franks, as Vice President of the Board and the Cooperative's "Parking Coordinator," were and are managing agents and agents of the Cooperative.

138. Hudson North Management, as the Cooperative's property manager, and Tancredi, as an employee of the Management Company and working as the property manager for the Cooperative, were managing agents and agents of the Cooperative.

139. Gramatan Management, as the Cooperative's property manager, is a managing agent and agent of the Cooperative.

140. Fierstein, as President of Gramatan Management, and Gutekunst, as Vice President of Gramatan Management, are agents of Gramatan Management, and upon information and belief, agents of the Cooperative.

141. Under the WCFHL, an unlawful discriminatory real estate practice includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public or common areas." WCFHL § 700.21(A)(9)(c)(ii).

142. Mr. Mosca requires the Parking Spot in order for him to receive sufficient care and safe transportation to and from the Apartment, and is therefore necessary to afford Mr. Mosca an equal opportunity to use and enjoy the Apartment.

143. Defendants' conduct described above, in particular revoking and refusing to reinstate Mr. Mosca's Parking Spot or otherwise reasonably accommodate his disabilities,

constitutes a refusal to make a reasonable accommodation in rules, policies, practices, or services in violation of the WCFHL.

144.     If there is a valid and binding regulation that does not accord Mr. Mosca the right to a parking spot, the Defendants are selectively enforcing such regulation in an intentionally discriminatory manner.

145.     Under WCFHL § 700.21(A)(10), it is an unlawful discriminatory real estate practice for any person " to coerce, intimidate, threaten or interfere with any person in the exercise of . . . any right granted in this section."

146.     Under WCFHL § 700.23(B), it is "an unlawful discriminatory real estate practice for any person engaged in any activity to which this article applies to coerce, intimidate, threaten, interfere with, retaliate or discriminate against, or attempt to coerce, intimidate, threaten, interfere with, retaliate or discriminate against any person" in the exercise or enjoyment of, or on account of having exercised or enjoyed, his or her protected rights under the WCFHL.

147.     Defendants' conduct described above, in particular, Donahue parking his vehicle in the Parking Spot on account of Mr. Mosca exercising his rights under the WCFHL with Defendants' knowledge and consent, thereby intimidating, discriminating, and retaliating, or attempting to do the foregoing, against Mr. Mosca in the exercise of his protected rights, constitutes unlawful discrimination and retaliation under WCFHL.

148.     Under WCFHL § 700.23(A), it is "an unlawful discriminatory real estate practice for any person to solicit, request, command, importune, compel or coerce" the doing or attempt to do any unlawful discriminatory real estate practice.

149.     Upon information and belief, Defendants committed unlawful discriminatory real estate practices in soliciting, requesting, commanding, importuning, compelling or coercing the doing of the above unlawful discriminatory real estate practices, or attempting to do so.

150.     Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

151.     Defendants acted intentionally with malice or a reckless indifference to Mr. Mosca's statutorily protected rights.

152.     Accordingly, under Article II of the Westchester Human Rights Law § 700.33, Plaintiff is entitled to actual damages, damages for humiliation and mental suffering, punitive damages, injunctive relief, and reasonable attorneys' fees and costs. In addition, this Court should order the Defendants to pay civil penalties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in their favor as follows:

A.     Declaring that the Defendants, by revoking and refusing to reinstate Mr. Mosca's Parking Spot or otherwise reasonably accommodate his disabilities, refused to make a reasonable accommodation in rules, policies, practices, or services in violation of the FHA, NYSHRL, and WCHRL;

B.     Permanently enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation with them, from:

1)     Refusing to reinstate Mr. Mosca's Parking Spot;

2) Revoking Mr. Mosca's parking privileges so long as he resides in the Apartment or any other apartment at the Property;

3) Failing or refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford Mr. Mosca, or any other resident with a handicap or disability, an equal opportunity to use or enjoy the premises;

4) Retaliating against Mr. Mosca or any other person in violation of the FHA, NYSHRL, and/or WCHRL, and

5) Otherwise engaging in conduct that violates the FHA, NYSHRL, and/or WCHRL.

C.  Awarding Plaintiff damages, including actual and compensatory damages, for the losses incurred and emotional distress, mental anguish, humiliation, embarrassment, and inconvenience suffered as a result of the Defendants' discriminatory conduct, pursuant to 42 U.S.C. § 3613(c), New York Executive Law § 297(9), and Westchester County Human Rights Law § 700.33(E);

D.  Awarding Plaintiff punitive damages, pursuant to 42 U.S.C. § 3613(c), New York Executive Law § 297(9), and Westchester County Human Rights Law § 700.33(E);

E.  Awarding Plaintiff costs and reasonable attorneys' fees, pursuant to 42 U.S.C. § 3613(c), New York Executive Law § 297(10), and Westchester County Human Rights Law § 700.33(E), and Fed. R. Civ. P. 54(d);

F.  Ordering Defendants to pay civil fines and penalties, pursuant to New York Executive Law §§ 297(4) and (9) and Westchester County Human Rights Law § 700.29(B); and

G.  Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Mosca demands trial by jury in this action of all issues so triable.

Dated:    February 16, 2011
              Newburgh, New York

Respectfully Submitted,

LEGAL SERVICES OF THE HUDSON VALLEY

Lara Kasper-Buckareff
Bar ID: LK1974
Legal Services of the Hudson Valley
123 Grand Street
Newburgh, NY 12550
Tel: (845) 569-9110 Ext. 120
Email: lbuckareff@lshv.org